UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| HERREN FARMS, LLC,<br><br>         *Plaintiff,*<br><br>  v.<br><br>LAWRENCE E. MARTIN,<br>*t/a LnR Feed & Grain Handling Systems*<br><br>         *Defendant.* | CASE NO. 3:21-cv-00025<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

  Plaintiff's 115-foot grain elevator collapsed on a windy day in April of 2017, causing over half a million dollars of property damage. Plaintiff now seeks to recover those losses in this breach of contract suit against Defendant, who sold and assembled the elevator just six months prior to its failure. According to Plaintiff, Defendant breached his implied duty of care by improperly installing the elevator's guy wires and support brackets—two stabilizing systems that would have prevented the elevator from falling.

  Currently before the Court is Defendant's motion for summary judgment, which turns solely on Defendant's contention that the statute of limitations has run on Plaintiff's claim. The question comes down to which of Virginia's statutory periods applies: (1) that relating to the sale of goods, (2) that relating to unsigned contracts for services, or (3) that relating to signed contracts for services. Plaintiff's claim is time-barred if governed by the first two provisions. But it is timely under the third. Defendant's motion will be denied because a rational factfinder could conclude that the parties' contract is signed and is for services.

## I. Background

Plaintiff owns and operates a small farm outside of Culpeper, Virginia. Complaint ¶ 1.[1] In the summer of 2016, Plaintiff decided to expand its grain handling and storage facilities by having Defendant, a "Feed and Grain Systems Design and Build Contractor," *see* Dkt. 31-1, erect three large grain silos and a 115-foot grain elevator on his property. *See* Dkt. 31-8 p. 12 (engineer's drawing of elevator and grain bins). This final design was the culmination of several days of back-and-forth negotiations with Defendant, whereby Defendant submitted drawings and quotes for Plaintiff's review.

The first piece of correspondence in the record is an email dated June 28, 2016, in which Defendant previewed three designs for Plaintiff in illustration of "the general idea of what you can do." *See* Dkt. 31-2 p. 1. Following some discussion, Defendant returned to Plaintiff a few days later (again by email) with detailed specs for a facility utilizing a 75-foot grain elevator, as well as a conveyor system to transport grain to the largest of three silos. *See* Dkt. 31-3. In addition to the itemized "Estimate/Contract" documents that came as attachments to this email, the body of the email included a summary of costs and instructed Plaintiff to "return with your written approval and a 10% deposit to order." *Id*. p. 1. Negotiations continued. Defendant sent Plaintiff a subsequent email later that same day promoting an alternative design, this time featuring a 115-foot elevator that would save money by obviating the need for a conveyor system. *See* Dkt. 31-4. The signature line in the body of each of Defendant's emails bore Defendant's name in cursive font.

Defendant eventually emailed detailed proposals for the construction of a grain handling and storage system utilizing the 115-foot elevator design. *See* Dkt. 31-5. The

---

[1] Plaintiff's Complaint can be found at Dkt. 1-1 pp. 7–9.

"Estimate/Contract" documents once more came in the form of email attachments, with the body of each email carrying Defendant's electronic signature and the opening email repeating Defendant's instruction to Plaintiff to "return with your written approval and a 10% deposit to order." *See id*. p. 7. The total estimate for the final version of the project was $285,752.00. *Id*. p. 4. This included $26,839.00 in labor for Plaintiff to "[a]ssemble and erect" the elevator. Dkt. 29-2 p. 6.

If that last number seems high, consider that the 75-page assembly manual provided by the elevator's manufacturer instructs that "[q]ualified civil engineers and contractors should be relied upon for site design, layout and construction. This manual is to be used as a guideline only." Dkt. 31-7 p. 3. And in the section relating to guy wire brackets, the manual specifically provides that "Customer (or its retained engineer or construction supervisor) is responsible [to determine suitable guying and/or bracing methods and materials] and should give consideration to . . . wind loads." *Id*. p. 44. The role of the installer becomes especially critical where, as with Plaintiff's project, accessory equipment is involved. On page 18, under the heading "Pre-Installation Information," the manual states:

> Bucket Elevators are designed to be vertically self-supporting when erected, but must be supported or guyed against wind loads. This elevator has not been designed to support other equipment such as cleaners, distributors, spouting, etc. Separate structures must be provided to support any accessory equipment. . . . It is the responsibility of user and/or installer to consult a civil or structural engineer regarding installation, including but not limited to construction, supervision, foundation, guying or bracing for specific site.
>
> **NOTE:** The **MOST IMPORTANT** preparations are retaining a licensed engineer to plan installation and a qualified millwright or contractor to erect elevator and accompanying equipment and structures.

Plaintiff's grain elevator incorporated both a distributor and downspouting system. *See* Dkt. 29-2 p. 1.

In addition to professional engineers, Plaintiff's affidavit reflects that "proper construction" of the elevator required "a crane, a forklift, field welding, *the fabrication and installation of guy wire and bracing systems*, as well as concrete footings and anchoring for the more than ten story tall structure." Dkt. 31 ¶ 18 (emphasis added). Defendant confirmed in his deposition testimony that the assembly and erection of the elevator required "on-site welding and brackets for the guy wires," which were his responsibility. Dkt. 32-1 (Martin Deposition) 46:20–47:4.

Defendant in fact did not retain or consult any civil or structural engineers when erecting Plaintiff's elevator. *See id.* 43:2–17. He also installed the guy wire brackets at greater intervals, used two fewer guy wires, and used fewer concrete anchors than instructed by the manufacturer. *See id.* 43:18–46:19.

As previewed above, Plaintiff's elevator collapsed in high winds only a few months after its construction. An engineering report prepared by Plaintiff's insurer concluded that the collapse resulted from Defendant's failure to adequately design and manufacture the elevator's wind-loading restraints. *See* Dkt. 31-8 p. 8. Defendant does not dispute that conclusion. *See* Martin Deposition 47:6–18.

## II. Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering whether the record rationally supports the facts necessary to the nonmovant's case,

the Court must take "the evidence and all reasonable inferences drawn therefrom in the light most favorable to the nonmoving party." *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc). Nevertheless, a party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (cleaned up). Moreover, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48 (emphasis original). The nonmoving party must produce "significantly probative" evidence from which a reasonable jury could return a verdict in his favor. *Abcor Corp. v. AM Int'l, Inc.*, 916 F.2d 924, 930 (4th Cir. 1990) (quoting *Anderson*, 477 U.S. at 249–50).

## III. Analysis

The sole question before the Court is whether there is a genuine issue of material fact concerning which of Virginia's statutory periods applies to Plaintiff's claim. The parties have narrowed the field to three. If the relevant contract is one for the sale of goods, then Va. Code § 8.2-725—Virginia's Uniform Commercial Code (UCC) homolog—governs and Plaintiff's claim is time-barred by that provision's four-year term. Alternatively, if the Court determines that the parties' contract is for services, then Va. Code § 8.01-246 governs. Paragraph 4 of that provision provides for a 3-year period for *unsigned* contracts; Plaintiff's claim would still be barred. But Paragraph 2 provides for a five-year term for *signed* contracts. In short, a rational jury could find Plaintiff's claim timely only if it could also find that the relevant contract is for services and is signed.

**A. A rational factfinder could find that the contract is for services**

Title 8.2 of the Virginia Code is intended to apply to transactions for goods. Va. Code § 8.2-102. The term "goods" includes things "which are movable at the time of identification to the contract for sale" and cannot include fixtures to reality unless intended "to be severed from realty." *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 259 (Va. 2019) (quoting Va. Code § 8.2-105(1)). That definition would appear necessarily to exclude the contract at issue here, which is for the construction of a grain handling and storage facility consisting of a 115-foot elevator and three large silos capable of holding an aggregate of nearly 200,000 bushels of grain. *See id.* at 259 (following this reasoning to conclude that Virginia's UCC statute does not apply to new-home-construction contracts).

Even if the transaction were thought to involve both goods and services, a factfinder could reasonably conclude that the UCC statute is inapplicable. Where hybrid contracts are at issue, the applicability of UCC provisions depends on whether the predominant purpose of the transaction is the rendition of services (with goods incidentally involved) or the sale of goods (with labor incidentally involved). *RMS Tech., Inc. v. TDY Indus., Inc.*, 64 F. App'x 853, *2 (4th Cir. 2003) (applying test outlined in *Princess Cruises, Inc. v. Shatterproof Glass Corp.*, 143 F.3d 828, 832–33 (4th Cir. 1998) to determine whether UCC statute of limitations applied).

The following three factors are considered helpful in determining the primary purpose of a contract: "(1) the language of the contract; (2) the nature of the business of the supplier; and (3) the intrinsic worth of the materials." *Id.* at *3 (citing *Coakley & Williams*, 778 F.2d at 197). Following these guideposts, and viewing the facts in the light most favorable to Plaintiff, a factfinder could reasonably conclude that the underlying transaction primarily concerned services. *Cf. Coakley & Williams, Inc. v. Shatterproof Glass Corp.*, 706 F.2d 456, 460 (4th Cir.

1983) (describing as a jury issue the question whether contract predominantly concerned the sale of goods or services); 25 A.L.R. 6th Art. 4 § 3 ("It is said that whether a mixed or hybrid contract involving both goods and services is predominantly for goods, and thus governed by Article 2 of the UCC, or for services, and thus outside its purview, is generally a question of fact for the jury.").

First, although it is certainly true that more text in the "Estimate/Contract" documents is devoted to describing the materials necessary to complete Plaintiff's project, the text also reflects that the assembly of those materials was a major aspect of what was bargained for. The contract quoted tens of thousands of dollars for labor. Second, the record shows that the nature of Defendant's business required the expert judgment of engineers, heavy machinery, custom components, and the skill of on-site welders. It is also significant that Defendant was not the manufacturer or retailer of the raw materials involved. The only value added by Defendant was in delivery and assembly. And third, while the cost of materials predominated over the cost of Defendant's labor, that is genuinely true of construction contracts, which are nevertheless almost uniformly considered contracts for services. *See Tingler* 834 S.E.2d at 259.

As with a contract with an artist for a painting, where the buyer's purchase of canvas and paints is incidental to the artist's provision of services, it would not be unreasonable to conclude that Plaintiff's purchase of premanufactured elevator parts was incidental to the provision of Defendant's services in assembling the elevator. *Cf. Princess Cruises*, 143 F.3d at 833 (looking for guidance in contrasting two paradigmatic examples of a contract with an artist for painting, which is a contract for services, and a contract with the manufacturer of a water heater that includes installation, which is a contract for goods).

**B. A rational factfinder could find that the contract is signed**

This case is somewhat unusual in that Defendant does not dispute that his emails were legally binding written offers. He argues only that the signature predicate of Va. Code § 8.01-246(2) is not met. To recap, Defendant sent "Contract/Estimate" documents to Plaintiff as email attachments, with the body of Defendant's emails containing a cost summary and Defendant's electronic signature, and the first email in each exchange also containing an instruction in the body of the email that Plaintiff "return with your written approval and a 10% deposit to order." *See* Dkt. 31-3 p. 1 (75-foot elevator quote); Dkt. 31-5 p. 7 (115-foot elevator quotes).

Virginia's Uniform Electronic Transactions Act provides that an "electronic signature" is any "symbol . . . attached to or logically associated with a record and executed or adopted by a person with the intent to sign the record." Va. Code § 59.1-480. There is surprisingly little caselaw on the issue of how the Uniform Electronic Transactions Act applies to contractual offers transmitted by email attachment. *See generally Williamson v. Bank of New York Mellon*, 947 F.Supp.2d 704, 710 (N.D. Tx. 2013) (discussing legal effect of email signature under Uniform Electronic Transactions Act and citing cases). But given the relevant context, and the plain language of Va. Code § 59.1-480, the Court concludes that a rational jury could find that Defendant's name in the signature line was "attached to or logically associated" with Plaintiff's offers "with the intent to sign." *Cf. Bray v. Brown*, 521 S.E.2d 526, 527–28 (Va. 1999) (reaffirming Virginia's longstanding practice of looking to the plain meaning of an unambiguous statute). If so, Defendant's electronic signature has the same legal effect as any pen-and-ink signature. *See* Va. Code § 59.1-485(d) ("If a law requires a signature, or provides for certain consequences in the absence of a signature, an electronic signature satisfies the law.").

## IV. Conclusion

The contract to build Plaintiff's grain silos was delivered by an email containing Defendant's electronically generated signature. A rational jury could call that a signed contract. Moreover, the contract was for the erection of three large grain silos and a 115-foot elevator—a task which required the judgment of professional engineers and skilled tradesmen. A rational jury could deem that a contract for services. If the jury does, in fact, find that the parties' contract is for services and is signed, Plaintiff's claim is not time-barred as Defendant contends. Accordingly, Defendant's motion for summary judgment will be denied.

\* \* \* \*

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this __18th__ day of July 2022.

_____
NORMAN K. MOON
UNITED STATES DISTRICT JUDGE